1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

UNITED STATES OF AMERICA,

11

Plaintiff,

12

v.

CASE NO. C07-1261RAJ

13

10.56 ACRES, MORE OR LESS,
SITUATED IN WHATCOM COUNTY,
WASHINGTON, et al.,

ORDER

14
15

Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment (Dkt.

## 14, 17).  Although the United States has requested oral argument, the court finds the

purely legal question that these motions present suitable for disposition on the basis of the

parties' motions and submissions in support thereof.  For the reasons stated below, the

court GRANTS Defendants' motion (Dkt. # 14) and DENIES the United States' motion

(Dkt. # 17).

## II.  BACKGROUND

The United States is expanding its port of entry facility at the "Peace Arch"

Canadian border crossing near Blaine, Washington.  Interstate 5 ("I-5") is the principal

highway bringing travelers to the Peace Arch.  The property at issue in this action

ORDER – 1

consists of several parcels of land that Washington (the "State") owned until the United States condemned them. The parcels serve as rights-of-way for I-5 near the Peace Arch.

The facts necessary to dispose of the motions before the court are not in dispute. To prepare for the port of entry expansion, the United States acquired the property through eminent domain. The State does not contest the United States' right to condemn the property.

I-5 is currently a ground-level roadway at the Peace Arch. The port of entry expansion, however, will require that a portion of I-5 be reconstructed as an elevated roadway passing over the expanded port of entry. The United States intends to construct the elevated roadway. The State does not dispute that the elevated roadway will have at least enough traffic capacity to serve as an adequate substitute for the existing roadway. After completing construction, the United States will transfer ownership of the elevated roadway itself back to the State by conveying air rights above the condemned property, along with surface and subsurface rights sufficient to permit maintenance of the elevated roadway. In the end, the State will own the elevated roadway, just as it owned the current ground-level roadway. Critically for purposes of these motions, the State will also be responsible for operating and maintaining the elevated roadway throughout its lifespan, just as it was responsible for operating and maintaining the ground-level roadway.

The parties also do not dispute, at least for purposes of these motions, that the elevated roadway will impose greater operating and maintenance costs on the State than continued operation of the ground-level roadway would have. The parties have reached no agreement as to the amount by which costs will increase, but the State asserts that operating and maintaining the elevated roadway will cost an additional $12 million over its lifespan. The court adopts that figure solely for illustrative purposes in resolving these motions.

The United States asserts that conveying the elevated roadway to the State will satisfy its constitutional obligation to justly compensate the state for the condemned

ORDER – 2

1 | property. The State contends that the United States must also compensate it for the

2 | increased operating and maintenance costs of the elevated roadway.

3 | ### III. ANALYSIS

4 | **A.     These Motions Present a Purely Legal Takings Clause Question.**

5 | The instant dispute comes to the court on motions for summary judgment, but its

6 | disposition turns solely on a legal question: does the "substitute facilities doctrine"

7 | permit a court to award a condemnee compensation for the increased costs of operating

8 | and maintaining an adequate substitute facility? Before turning to the Fifth Amendment

9 | underpinnings of that legal question, the court notes that on a motion for summary

10 | judgment, the court defers to neither party in resolving legal questions. *See Bendixen v.*

11 | *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) (noting that if "a motion for

12 | summary judgment is merely the conduit to bring [a] legal question before the district

13 | court," then "the usual tests of summary judgment, such as whether a genuine dispute of

14 | material fact exists, do not apply."). The motions before the court raise no disputed

15 | issues of material fact, rendering further discussion of the standard for summary

16 | judgment unnecessary. *See* Fed. R. Civ. P. 56(c) (establishing that summary judgment

17 | should be rendered when "there is no genuine issue as to any material fact and . . . the

18 | movant is entitled to judgment as a matter of law").

19 | The Fifth Amendment's Takings Clause prohibits the taking of "private property"

20 | for "public use" without "just compensation." U.S. Const. amend. V. State property that

21 | the federal government condemns is considered "private property" subject to the Takings

22 | Clause. *United States v. 50 Acres of Land ("Duncanville")*, 469 U.S. 24, 31 (1984). In

23 | this case, the State does not dispute that the United States condemned the property for

24 | public use. The only question before the court, therefore, is what constitutes "just

25 | compensation" for the instant taking.[1]

26 |

27 | [1] There is no dispute that the State has preserved its right to contest the compensation it is entitled to from the United States. *See* Fed. R. Civ. P. 71.1, 71.1(e)(3).

28 | ORDER – 3

The presumptive measure of just compensation is the fair market value of the condemned property at the time of the taking. *Duncanville*, 469 U.S. at 29. For some property, however, fair market value is impossible to determine. Property that is "seldom, if ever, sold in the open market" has no ascertainable market value. *Id.* at 30. Property dedicated solely to public facilities like townships, roads, public playgrounds, or sewer systems typically has no market value. *See*, *e.g.*, *id.* at 30 n.12; *United States v. 564.54 Acres of Land*, 441 U.S. 506, 513 (1979); *United States v. Certain Property in Manhattan ("Recreation Center")*, 403 F.2d 800, 802-03 (2d Cir. 1968). In this case, the parties agree that the condemned property, which served solely as a right-of-way for I-5, has no ascertainable market value.

Courts have developed the substitute facilities doctrine to address just compensation for the condemnation of public facilities without market value. *See Duncanville*, 469 U.S. at 31-32 (pointing to a dictum in *Brown v. United States*, 263 U.S. 78, 83 (1923) "as the source of what has become known as the 'substitute facilities doctrine'"). Although the parties dispute the precise formulation of the doctrine, it suffices for introductory purposes to note that it requires the condemnor to compensate the condemnee for the cost of an adequate substitute facility. *See, e.g., California ("San Francisco Tidelands") v. United States*, 169 F.2d 924, 925 (9th Cir. 1948); *Recreation Center*, 403 F.2d at 803 ("Simply stated, this rule insures that sufficient damages will be awarded to finance a replacement for the condemned facility.") (cited in *Duncanville*, 469 U.S. at 32 n.16). The substitute facilities doctrine applies only where the fair market value of the condemned property is not ascertainable. *Duncanville*, 469 U.S. at 26.

In this case, the parties do not dispute that the substitute facilities doctrine applies. Instead, they dispute whether, in addition to the elevated roadway that the United States has agreed to provide, the State is entitled to the increased operation and maintenance costs of the roadway. Neither Supreme Court nor Ninth Circuit authority squarely resolves this legal dispute, but, for the reasons stated in the next section, the court's

ORDER – 4

review of existing case law leads it to conclude that the State is entitled to the increased costs of operating and maintaining the elevated road.

## B. A Court May Award Money Damages for Increased Costs in Addition to an Adequate Substitute for a Condemned Facility.

The parties focus much of their attention on *Washington v. United States* *("Hanford")*, 214 F.2d 33 (1954), which arose in the wake of the United States' condemnation of property for the Hanford Atomic Energy Project. The court concluded that the State was entitled only to nominal damages for the condemnation of a 28-mile section of a highway traversing the Hanford Project. *Id.* at 36-37. The court found that the condemnation of other lands to create the Hanford Project had so greatly reduced the need to travel on the road that existing state highways were adequate to serve any remaining traffic. *Id.* at 41-44 (reviewing evidence before trial court). The court concluded that "since there was [sic] in existence adequate substitutes for Highway 11A, there was no reasonable necessity for its replacement." *Id.* at 44. For that reason, the court affirmed the trial court's one-dollar nominal damages judgment as compensation for the taking. *Id.* at 47.

Because the *Hanford* court found that no substitute facility was necessary, it addressed the proper compensation under the substitute facilities doctrine only in dicta. *See* 214 F.2d at 47 ("Since there existed no reasonable necessity in 1943 for replacing the highway taken, we never reach the question of the reasonable substitute, and its costs."). The dicta in *Hanford* is plentiful, and the United States frequently relies on it. It insists, for example, that the *Hanford* court imposed two mutually exclusive compensation alternatives when it stated that where "no other road . . . can adequately handle the traffic diverted from the road taken, the government is required to provide a substitute road *or* its equivalent in money." *Id.* at 40 (emphasis added). In the United States' view, the State is entitled to money or a substitute facility, but never both. Similarly, the United States seizes upon the *Hanford* court's quotation of other cases for the proposition that

ORDER – 5

providing a substitute facility of "equal utility" satisfies its compensation obligation. 214

F.2d at 40 (quoting *Jefferson County v. Tennessee Valley Authority*, 146 F.2d 564, 565

(6th Cir. 1945), and *City of Fort Worth v. United States*, 188 F.2d 217, 222 (5th Cir.

1951)). Because the elevated roadway will undisputedly convey traffic just as effectively

as its surface-level predecessor, the United States claims that it has provided a substitute

of equal utility, thus satisfying its "just compensation" obligation.

Neither of the United States' interpretations of *Hanford* withstand scrutiny.

Neither *Hanford* nor any other authority bars a court from awarding "just compensation"

that combines a substitute facility with a monetary award. Setting "equal utility" as the

standard of compensation does little to settle this dispute. The State's contention is that

the elevated roadway is not equal in utility to its predecessor, because the elevated

roadway will cost an additional $12 million to convey traffic equally effectively. The

United States' implicit assertion that "utility" means no more than functionality is

unsupported by case law or logic. If, hypothetically, the United States built a shoddy

temporary overpass to replace the condemned roadway, knowing that it would last no

more than a year under normal traffic conditions, it surely could not argue that providing

a functional replacement roadway obviated the need to pay compensation for the

inevitable construction of a permanent substitute. The court's duty is to fashion an award

that permits the State to "readjust its . . . highway system to serve [its] requirements and

needs in as adequate a manner and extent and with equal utility as such system would

have provided had the facility in question not been condemned, so far as this is

reasonably practical." *Fort Worth*, 188 F.2d at 222 (cited in *Hanford*, 214 F.2d at 40).

Here, assuming the accuracy of the State's projection of increased costs, it cannot meet

its traffic needs without spending $12 million more than it would have spent absent the

condemnation. If the United States' obligation is to pay "the entire cost of restoring to

[the State's] citizens an adequate highway system," *Jefferson County*, 146 F.2d at 566,

ORDER – 6

then it must pay the increased cost of maintenance as well. *See also id.* at 565 (noting

obligation to "pay the cost of road facilities equal to those destroyed").

Other Ninth Circuit authority, and out-of-circuit authority on which the Ninth

Circuit has relied, is also inconsistent with the United States' assertion that the court

cannot award increased costs. The court noted in the previous paragraph that the

formulations of the substitute facilities doctrine in *Fort Worth* and *Jefferson County*

support the State's position. In *San Francisco Tidelands*, the court noted that the

"fundamental principle" of the substitute facilities doctrine is that "the public authority

charged with furnishing and maintaining the public way . . . must be awarded the actual

money loss which will be occasioned by the condemnation[,] . . . usually the cost of

furnishing and constructing substitute roads." 169 F.2d at 925 (quoting *United States v.*

*Arkansas*, 164 F.2d 943, 944 (8th Cir. 1947)).[2] Maintenance and related costs are thus

appropriate to consider when considering the loss to the condemnee.[3] Indeed, when

courts award nominal damages to condemnees who have no need to build substitute

facilities, they inevitably note that the condemnee is relieved of the "burden of

maintaining" the taken facility. *E.g.*, *Hanford*, 214 F.2d at 39 (quoting *San Francisco*

*Tidelands*, 169 F.2d at 924); *California ("Naval Shipyard") v. United States*, 395 F.2d

261, 265 n.8 (9th Cir. 1968) (citing cases). Courts properly consider increased or

decreased costs when determining just compensation for condemned public facilities.

*See Naval Shipyard*, 395 F.2d at 265 n.8; *see also Jefferson County*, 146 F.2d at 565

---

[2] The *San Francisco Tidelands* court, like the *Hanford* court, concluded that no substitute was necessary for the condemned property. 169 F.2d at 925. Its comments on the assessment of appropriate compensation where a substitute is necessary are, like similar comments in *Hanford*, dicta.

[3] Two other out-of-circuit cases recognize maintenance costs as an element of just compensation. In *United States v. Wheeler Township*, the court noted that there is "no injustice to [the condemnor] in being required to make good to the township taxpayers the added expense for that character of construction and maintenance of . . . established roads." 66 F.2d 977, 985 (8th Cir. 1933). In *Town of Bedford v. United States*, 23 F.2d 453, 456 (1st Cir. 1927), the court recognized the condemnee's property right as the "right to exoneration from the burden of constructing and maintaining a substitute way."

ORDER – 7

(noting that the local government is burdened with "the construction and maintenance of highways"). Indeed, in *United States v. Arkansas*, the court awarded increased operational costs to the local government to compensate it for a temporary ferry it was obliged to operate during the construction of a substitute highway. 164 F.2d at 944-45.

The substitute facilities doctrine requires compensation for the cost of a necessary substitute facility. Here, although the United States will foot the bill for the construction of an adequate substitute, it asserts that it can avoid payment for the additional costs that its substitute will impose on the State. Principles of Fifth Amendment "just compensation," as expressed by courts that have considered appropriate compensation for the condemnation of public facilities, are broad enough to encompass such costs.

Before concluding, the court addresses several of the United States' additional arguments for avoiding payment for increased maintenance and operational costs. First, the court places no weight on the absence of claims for increased costs in other cases that invoke the substitute facilities doctrine. For example, the United States contends that Washington's failure to seek additional maintenance costs for the longer highway that was found to be an adequate substitute for the condemned highway in *Hanford* suggests that such costs are not permissible as a component of just compensation. The inference that the United States urges upon the court is no more plausible than any other hypothetical explanation for Washington's silence in *Hanford*: the substitute highway was an existing facility, not a newly constructed one, so there may have been no increase in maintenance costs; Washington may have never considered its additional maintenance costs; Washington may have found that the decrease in maintenance costs attributable to the condemnation more than offset any increase in costs at the substitute highway. There is no reason for the court to interpret the silence of litigants in decades-old cases as favoring the United States' position.

Second, while the court acknowledges that "consequential damages" to the condemnee are not compensable under the Fifth Amendment (*Duncanville*, 469 U.S. at

ORDER – 8

33, *United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 282-83 (1943)), the damages the State claims here have never (so far as the court is aware) been declared "consequential" by any other court. Consequential damages include opportunity costs, lost profits from the operation of an enterprise located on the taken property, loss of goodwill, and relocation expenses. *E.g., Powelson*, 319 U.S. at 281-82; *United States v. General Motors Corp.*, 323 U.S. 373, 379-80 (1945); *United States v. Petty Motor Co.*, 327 U.S. 372, 378 (1946). In light of previously cited authority that places maintenance and operation costs within the realm of compensable damages, the court cannot accept the United States' assertion that such costs are incompensable consequential damages. Indeed, in *United States v. Arkansas*, the court distinguished the operating cost of a ferry used as a temporary substitute facility from the consequential damages deemed incompensable in *Petty Motor*. 164 F.2d at 944-45.

The United States' reliance on *United States v. 25.4 Acres of Land ("New York Trolley")*, 71 F. Supp. 255 (E.D.N.Y. 1947) is misplaced for similar reasons. There, the court concluded that New York City had failed to establish that a trolley-track reroute required after a condemnation caused it to suffer an operating loss on the trolley line. *Id.* at 262 (finding that the "greater outlay in the cost of operation . . . has been compensated by a higher percentage of net revenue per car mile"). The *New York Trolley* court did not exclude the possibility that increased operations costs might justify an increase in compensation to the condemnee, it merely found that the condemnee had not established a net increase in operations costs.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS the State's summary judgment motion (Dkt. # 14) and DENIES the United States' summary judgment motion (Dkt. # 17). The court holds that increased maintenance and operation costs occasioned by the elevated roadway may be considered in determining the just compensation due to the

ORDER – 9

State, and that just compensation may include a monetary award in addition to the substitute facility.

The court emphasizes that its holding today does not establish that the State is entitled to money compensation in addition to the elevated highway. The court has accepted the State's assertion of increased maintenance costs solely for purposes of resolving the parties' legal question. As the parties have already agreed,[4] the amount, if any, of additional compensation owed to the State is a question of fact that the parties must resolve between themselves or by presenting their dispute to a trier of fact.

DATED this 22nd day of August, 2008.


The Honorable Richard A. Jones
United States District Judge

---

[4] At the parties' request, the court bifurcated this action between a determination of the legal question presented in these motions and, in the event the legal determination favored the state, discovery and motion practice devoted to determining just compensation. *See* Dkt. ## 11, 12.

ORDER – 10